UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff<br><br>v.<br><br>KYLE GERALD PRALL,<br>   a/k/a "Jacob Collins,"<br>   a/k/a "John Holloway,"<br><br>        Defendant | Crim. No. A:19-CR-013 RP |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America requests that defendant Kyle Gerald Prall be sentenced to 33 months in prison, the low end of the United States Sentencing Guidelines range, and three years of supervised release, consistent with the Plea Agreement. The United States further requests that the Court order the defendant to pay a $100 special assessment and $548,428 in restitution, and to forfeit $205,496.68 in proceeds obtained from the offense, consistent with Paragraph 7 of the Plea Agreement.

## INTRODUCTION

Falsely cloaking himself in the First Amendment, the defendant purported to raise money to support political candidates during the 2016 Presidential election, all the while preying upon the political passions of the American public for his own personal profit.

Over the course of 10 months, the defendant created three separate websites ostensibly simultaneously supporting each of the three leading candidates in the 2016 Presidential election, and soliciting contributions from American voters to further those purported objectives. In doing

1

so, he brought in $548,428 from more than 400 individual donors around the country, almost half of which—$205,496—he diverted to his own pocket for personal use, while spending the other half to create, maintain, and advertise his websites in an effort to fraudulently raise additional contributions. Less than $5,100—less than 1%—was contributed to actual political causes.

The defendant not only stole hundreds of thousands of dollars from his victims, perhaps more importantly, he stole their efforts to participate in the political process. The defendant's scheme specifically targeted and actually corrupted the political process, siphoning away hundreds of thousands of dollars provided to support candidates for the highest office in the country in one of the most passionately contested elections in history. Instead, the political contributions were spent on the defendant's personal travel, meals, alcohol, massages, and adult entertainment.

A sentence of 33 months in prison—the low end of the Guidelines—is both reasonable and appropriate to punish the defendant for his criminal conduct and to deter others from following in his footsteps.

**FACTUAL BACKGROUND**

A. <u>The Defendant Created Political Committees Soliciting Money Ostensibly to Support Each of the Major Presidential Candidates</u>.

Between December 2015 and November 2016, the defendant established and ran three political committees—Socially Responsible Government (also known as "Feel Bern"); HC4President; and Make America Great (also known as "Trump Victory")—purportedly to support and raise money for the three major candidates running for President in 2016. Presentence Investigation Report ("PSR") at ¶7. Though the defendant registered his committees with the Federal Election Commission ("FEC"), each committee effectively consisted of a website to solicit contributions and a bank account to deposit contributions. *Id.* at ¶¶7-9.

The defendant created his first website—Feel Bern—ostensibly in support of Presidential Candidate A in late 2015, mimicking many aspects of the official campaign, including the campaign slogan, "Feel the Bern." *Id.* at ¶¶11-12. The website used photos of Presidential Candidate A and a similar color scheme to the official website. Indeed, in December 2015, the defendant received a cease and desist letter from the official campaign accusing him of copying trademarks, logos, and content from the official website. While he ultimately changed the official name of the committee in filings with the FEC, he continued to use "Feel Bern" and other material and logos associated with Presidential Candidate A on the website. Between December 2015 and July 2016, the defendant raised over $300,000 in contributions through this website, of which he donated less than $4,000 to political causes. *Id.* at ¶12. Nevertheless, he paid himself a salary of $46,153 and transferred an additional $90,767 to himself through shell companies. *Id.* at ¶13.

Recognizing the success of his scheme, the defendant decided to create a second website falsely representing that he was supporting Presidential Candidate B in January 2016. *Id.* at ¶¶15-16. The defendant again chose a name—HC4President—and logo close in appearance to the official campaign, and used photos of Presidential Candidate B and a similar color scheme to the official website. In February 2016, Presidential Candidate B's campaign complained to the Department of Justice and the FEC about the defendant's "fraudulent website." The complaint was sent to the defendant that same month, yet he continued to operate his website in the very same manner for almost nine months until the election. Between January and November 2016, the defendant raised over $73,000 in contributions, of which he donated less than $1,100 to political causes. *Id.* at ¶16. He transferred $42,267 to himself through shell companies. *Id.* at ¶17.

In March 2016, the defendant created another committee, "Cruz Info President," ostensibly in support of another candidate, although that candidate suspended his campaign not long after. During the same month, however, the defendant created a website claiming to support Presidential Candidate C. *Id.* at ¶¶19-20. Again, the defendant chose a name—Trump Victory—closely associated with the official campaign, and mimicked the official campaign slogan, "Make America Great Again." Again, in May 2016, the defendant received a cease and desist letter from the official campaign, noting the defendant's use of the name, image, and slogan of the candidate, and stating: "The Campaign has never received money from your Super PAC, nor does the Campaign want any money, services, or goods from your committee." Again, the defendant continued his scheme undeterred. Between March and November 2016, the defendant raised over $165,000, none of which was donated to political causes. *Id.* at ¶20. He transferred $72,431 to himself through shell companies. *Id.* at ¶21.

    B. <u>The Defendant Made Specific Misrepresentations Calculated to Attract Contributions From Supporters of the Candidates</u>.

While each of the websites claimed to generally support the candidates for which they were named—indeed, they each falsely claimed to be backed by "volunteers from all walks of life" supporting the candidates through online marketing, television and radio advertising, and direct mailing—they also included specific misrepresentations about how the contributions would be spent. Plea Agreement at ¶4. The Feel Bern website falsely stated, "The donations will be used primarily to charter buses for transportation to voting polls . . . [and] to reimburse volunteers who use their own cars to transport people for fuel." PSR at ¶12. The HC4President website falsely stated:

> Your contribution goes directly toward paying for training volunteers to knock on doors,

4

make phone calls, and spread the word about [Presidential Candidate B]'s movement. It also helps pay for our initiatives to help voters obtain the appropriate ID and transportation to voting facilities. With your help we can take back our country.

*Id.* at ¶16. And, the Trump Victory website falsely stated: "We also donate the maximum allowed legal limits directly to [Presidential Candidate C] and other organization and nonprofits that are supporting [Presidential Candidate C]'s campaign for President." *Id.* at ¶20. In reality, none of the money was used for these represented purposes. Instead, the defendant diverted almost half of the contributions to his own pocket. *Id.* at ¶23. The other half were used to create, maintain, and advertise the websites to attract additional contributions. For example, more than $120,000 was paid to an independent contractor for online marketing services dedicated solely to driving Internet traffic to the websites; $80,000 was paid to Google and Facebook for online advertising and marketing of the websites; and more than $25,000 was spent in fees for online payment processing services, to allow the websites to accept online contributions.

    C. <u>The Defendant Concealed His Scheme Through Use of Shell Companies and Fake Names</u>.

To conceal his plundering of the contributions, the defendant created shell corporations—LRQ, DMF Marketing Solutions, NHT Productions, and Apex Marketing—through which he funneled the monies to himself under the guise of legitimate advertising expenditures. *Id.* at ¶¶8, 23. These shell companies were created for the sole purpose of surreptitiously siphoning money from the political committees into the defendant's personal bank accounts. *Id.* at ¶8. They were created at the same time as the political committees and websites, and were shut down soon after the election. *Id.* at ¶¶8, 23. They were incorporated in Michigan and Wyoming—two states with which the defendant had no connection—and none were associated with his name. The only deposits into the shell companies' accounts came from the defendant's three political committees;

and the only withdrawals were transfers to the defendant's personal accounts. To make the expenditures outwardly appear legitimate, however, the defendant classified payments to his shell companies as "advertising and promotions," "marketing/advertising expense," or "professional fees" on the FEC filings.   Plea Agreement at ¶4.

In addition to the creation and use of shell companies, the defendant took further steps to avoid detection of his scheme. Although the defendant had sole control over the expenditures of the fraudulent political committees, he recruited two "straw" treasurers to put their names on the FEC filings, so that two of the committees would not be publicly associated with his name. He also used two fake names—Jacob Collins and John Holloway—and email accounts in those names when corresponding with vendors and contributors to the political committees.

D. <u>The Defendant Stole Additional Monies From the Political Committees to Pay for Personal Entertainment Expenses</u>.

In addition to pocketing more than $200,000 in contributions to his political committees, the defendant used the committees as his piggy bank to fund his personal travel and entertainment. From the Feel Bern bank account, the defendant spent $1,167.64 for a two-night stay at the Palms Hotel & Spa in Miami Beach, Florida, and $3,101.92 for a night of entertainment at the E11EVEN nightclub in Miami, Florida, including food, Hookah, alcohol and bottle service, and $1,470 for "club dances performed by entertainers."   PSR at ¶13.   He also spent $1,073.31 for a three-night stay at the Omni Barton Creek Resort in Austin, Texas, and $728.47 for room service and minibar charges, a deep-tissue massage, and a pet-cleaning fee during his stay. *Id*.

From the HC4President bank account, the defendant spent $952.40 for roundtrip airfare for he and his girlfriend to Jacksonville, Florida; $460.36 for room service, drinks at the lobby bar, and dinner for two at the Omni Hotel in Dallas, Texas; and $812.43 for roundtrip airfare to Belize.

*Id.* at ¶17.   Finally, from the Trump Victory account, the defendant withdrew $103 from the ATM at Bernie's Beach House bar and restaurant in Port Aransas, Texas.   *Id.* at ¶23.

In sum, the defendant's personal entertainment expenditures from the committees alone—totaling $8,296.53—exceeded the total amount of actual political contributions that he made from all three committees.

## ARGUMENT

I.   PURSUANT TO THE SENTENCING GUIDELINES, DEFENDANT SHOULD BE SENTENCED TO 33 MONTHS IN PRISON AND THREE YEARS OF SUPERVISED RELEASE.

The government submits that application of the Sentencing Guidelines results in a total offense level of 20, as described below, and a criminal history category of I, which results in a Guidelines range of 33 to 41 months in prison.

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)): | 7 |
| Specific Offense Characteristics: | |
|     Loss greater than $150,000 (§ 2B1.1(b)(1)(F)) | +10 |
|     Ten or more victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
|     Misrepresentation re political organization (§ 2B1.1(b)(9)(A)) | +2 |
|     Sophisticated means (§ 2B1.1(b)(10)(C)) | +2 |
| Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total Offense Level: | 20 |

The government addresses the two disputes regarding application of the Guidelines—(1) calculation of the loss amount, and (2) application of the specific offense characteristic for making a misrepresentation regarding a political organization—in turn below.

A.   Loss (§ 2B1.1(b)(1)(F))

In the Plea Agreement, the parties agreed that the defendant would be subject to a 10-

7

level increase for a loss greater than $150,000, but less than $250,000.  Plea Agreement at ¶3(c).  More specifically, the parties agreed that the actual loss was not reasonably determinable in this case, and therefore, the gain to the defendant—$205,496.68—should be used as an alternative measure of loss.  Using the gain results in a 10-level increase, rather than the 12-level increase proposed by the PSR, pursuant to U.S.S.G. § 2B1.1.

Pursuant to U.S.S.G. § 2B1.1, Application Note 3(B), "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  The parties agree there was a loss here, but, under the standard of proof required by the Guidelines, it cannot reasonably be determined.  Although the defendant made numerous misrepresentations on his websites about how he would use the contributions to his political committees, and he, in fact, used a significant portion of the contributions for illegitimate purposes such as his personal entertainment expenses, he also used some portion of the contributions for arguably legitimate political purposes as advertised on the websites.  For example, the defendant represented on the HC4President website, "We use online media, TV and radio advertising to educate the public on [Presidential Candidate B]'s experience and stances on the issues."  Similar representations were made on the Feel Bern and Trump Victory websites.  And, in fact, the defendant used some of the contributions to hire freelance writers to draft articles regarding the candidates' respective positions on various contested political issues (such as gun control, immigration, and criminal justice reform), which the defendant then posted on the websites.  In sum, it is difficult in this instance to separate the illegitimate expenditures from the legitimate for the purpose of determining "loss."

On the other hand, the gain—that which the defendant routed through shell companies to

8

his personal bank accounts—can be determined.  That amount is $205,496.68, which the parties agree is a reasonable proxy for the loss amount in this case.

Furthermore, the use of different figures for "loss" under the Sentencing Guidelines and "restitution" pursuant to the Mandatory Victims Restitution Act—as the parties agreed here—is supported by the case law.  While all of the victims should be made whole and have their contributions reimbursed in full through restitution, some portion of the contributions were used for arguably legitimate (or at least not criminal) purposes, and thus should be excluded from the loss calculation.  As courts have recognized, the "'loss' for determining the offense level is different from the 'loss' for restitution purposes." *United States v. Bazemore*, 839 F.3d 379, 388 (5th Cir. 2016) (quoting Robert W. Haines, Jr. *et al.*, *Federal Sentencing Guidelines Handbook* 1556-57 (2015-2016 ed.)); *see also United States v. Nosal*, 844 F.3d 1024, 1046 (9th Cir. 2016) ("[C]alculating loss under the guidelines is not necessarily identical to loss calculation for purposes of restitution." (citations omitted)).  Thus, "the amounts of loss and restitution can and do differ."  *United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010); *see, e.g.*, *United States v. Hebron*, 684 F.3d 554, 561, 564 (5th Cir. 2012) (upholding a loss calculation of $320,000 and a restitution order for $105,600); *United States v. Crawley*, 533 F.3d 349, 355-59 (5th Cir. 2008) (upholding a restitution order for $121,478.86 when loss under the Guidelines was calculated to be $1,091,244.19).

B.  Misrepresentation Regarding Political Organization (§ 2B1.1(b)(9)(A))

The defendant argues that the two-level upward adjustment for making a misrepresentation "that the defendant was acting on behalf of a . . . political organization," pursuant to U.S.S.G § 2B1.1(b)(9), does not apply because the defendant was, in fact, acting on

9

behalf of a political organization when he made his misrepresentations. The defendant's argument is foreclosed, however, by the Guidelines and Fifth Circuit case law.

To start, the Commentary for the applicable Guideline expressly states its application to the facts of this case:

> Subsection (b)(9)(A) applies in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable, educational, religious, or political organization, or a government agency (*regardless of whether the defendant actually was associated with the organization or government agency*) when, in fact, the defendant intended to divert all or part of that benefit (*e.g.*, for the defendant's personal gain).

U.S.S.G § 2B1.1, Application Note 8(B) (emphasis added). The parenthetical—which expressly clarifies that the upward adjustment applies "regardless of whether the defendant actually was associated with the organization or government agency"—was added specifically to resolve a circuit split on this issue. UNITED STATES SENTENCING GUIDELINES MANUAL, app. C (2001) (Amendment 617). "This change indicates that Congress, in enacting the current iteration, intended the enhancement to apply where the defendant misrepresents his *intentions*, regardless of whether he also misrepresents his *authority to act*." *United States v. Lambert*, 498 F.3d 963, 970 (9th Cir. 2007) (emphasis in original).

Following the amendment to the Guidelines, the Fifth Circuit expressly rejected the same argument the defendant makes here. *United States v. Reasor*, 541 F.3d 366, 372 (5th Cir. 2008). In *Reasor*, the defendant was employed as an office manager and bookkeeper of a church, and had authority to act on behalf of the church as a signatory for certain financial transactions. 541 F.3d at 367-68. During her employment, she fraudulently signed and issued checks to herself, which she then used for her personal benefit. *Id.* At sentencing, like the defendant here, she claimed that the upward adjustment pursuant to U.S.S.G. § 2F1.1(b)(4)(A) (the predecessor

10

guideline to § 2B1.1(b)(9)) did not apply, as she did not misrepresent her authority to act on behalf of the church because she had actual authority to make certain financial transactions. *Id.* at 370. The Fifth Circuit rejected that argument, holding that the enhancement was applicable when a defendant misrepresents that he or she was "acting wholly on behalf of" the covered organization and instead was acting, in part, for personal benefit. *Id.* at 372. Thus, the defendant's argument is foreclosed by the Fifth Circuit case law, and the two-level upward adjustment for the defendant's misrepresentation that he was acting on behalf of a political organization is applicable.

II.  APPLICATION OF THE FACTORS IN 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE OF 33 MONTHS IN PRISON AND THREE YEARS OF SUPERVISED RELEASE IS REASONABLE.

The Supreme Court has noted that the "Guidelines . . . seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 127 S. Ct. 2456, 2464 (2007). These factors or considerations include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence; and protect the public from further criminal conduct by the defendant. 18 U.S.C. § 3553(a).

A. <u>The Seriousness of the Offense Warrants a Sentence of 33 Months</u>.

Even viewing the defendant's conduct simply as a fraudulent scheme to obtain money from his victims, his crime is serious. In only 10 months, he took $543,328 from 423 identifiable victims, and personally pocketed more than $205,000. In addition, he spent another $8,000 on personal travel and entertainment expenses. The scope of his fraud alone merits a significant prison sentence.

11

But, the defendant's conduct did not just deprive his victims of money; rather he deprived them of something even greater—their ability to participate in the political process. The defendant developed a scheme intentionally designed to take advantage of the passion of the American public—and people's eagerness to contribute money to support their political views— in connection with the 2016 Presidential election. He masqueraded as a group of "volunteers" ardently supporting political candidates to solicit contributions from like-minded voters to further their joint cause. In doing so, the defendant stole money that the contributors hoped would go their chosen candidate's campaign, and money that the candidates or legitimate political action committees may have otherwise received and used to support the campaigns. While the defendant's underlying intent may have been merely to enrich himself—like all fraudsters—he did so knowing it was at the expense of the political process.

Finally, this is not a case where the defendant originally engaged in a lawful venture, but then made mistakes along the way or strayed from his original intent. The defendant intended this as a criminal scheme from the start and took measures to conceal his criminal conduct from authorities and the public. At the same time that the defendant created his fraudulent political committees, he also created sham LLCs to covertly divert contributions to his personal bank account. And, he began transferring money from the committees to himself through the sham LLCs—as well as directly charging his personal entertainment expenses to the committees— within approximately a month and a half of creating the committees. In an effort to further distance himself from the committees, he paid two nominees to list their names, in place of his own, as the "treasurers" of two of the committees on the filings submitted to the FEC. And, he used two fake names and email addresses when dealing with vendors and/or contributors to the

12

committees.   These are not the actions of an honest broker gone afield, but rather the calculating actions of a criminal fraudster.

      B.  <u>A Sentence of 33 Months' Imprisonment Would Deter Future Would-Be Fraudsters</u>.

To date, only two other scam-political committee, or "scam-PAC," operators have been convicted and sentenced for their criminal conduct, both of whom—unlike the defendant here—admitted their wrongdoing, accepted responsibility, and pleaded guilty prior to indictment.[1] Even still, both received significant prison sentences.   This defendant is the first scam-PAC offender to be federally indicted, and his sentence has the potential to deter similar criminal conduct during the 2020 Presidential election and beyond.

The advent of "super PACs"—and the ability to raise and contribute unlimited sums of money—has supercharged the sums of money contributed to political campaigns.   Perhaps not surprisingly, this has made political fundraising a ripe target for criminal fraud schemes. Schemes like the one perpetrated by the defendant directly injure the political process by both siphoning money intended to support political candidates and contributing to public mistrust in the political fundraising process.   This sentiment was echoed by a victim in this very case, who stated on his victim impact statement that he will "never donate to a political candidate again," and he has even curtailed his yearly contributions to charities.   Thus, the defendant's fraud scheme not only prevented 423 victims from participating in the political process during the 2016 Presidential election, but it likely chilled their future willingness—and the willingness of

---

[1] Harrold Russell Taub:   https://www.justice.gov/opa/pr/former-candidate-us-house-representatives-sentenced-after-conviction-fraud-and-campaign; William Tierney: https://www.justice.gov/usao-sdny/pr/fraudulent-political-action-committee-operator-sentenced-two-years-prison

13

others—to participate in the political process.

A significant prison sentence is necessary to protect the political process by deterring future would-be fraudsters from engaging in the same criminal conduct.

 C. The Requested Sentence Will Protect the Public From Defendant's Fraudulent Conduct.

While there is no specific evidence that the defendant poses a risk of re-offending, this is not a case where the defendant willingly stopped his own criminal conduct when his scheme was revealed. The defendant received cease and desist letters from two of the official campaigns, but continued with his fraudulent scheme. He received a complaint about his "fraudulent websites" filed with the Department of Justice and FEC, but continued unabated. Additional FEC complaints were filed and sent to the defendant, including regarding his sham LLCs; and, the defendant and his fraudulent scheme were also publicly detailed in newspaper articles in June 2016,[2] but the defendant continued to solicit and steal contributions through his websites through the November election. Even after being approached by two FBI agents at his house in May 2016 regarding the complaint sent to the Department of Justice—after which the defendant accused the FBI of harassment—the defendant remained unfazed and continued his fraud for almost six more months until the election. In sum, nothing short of criminal prosecution was sufficient to deter the defendant, and a sentence of imprisonment within the Guidelines is appropriate to deter the defendant from future criminal schemes and to protect the community.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court

---

[2] *See* Jay Root, *Austin-Based Pro Sanders PAC Raises Questions*, Texas Tribune, June 24, 2016 (https://www.texastribune.org/2016/06/24/sanders-superpac-scam-complaint-says/).

determine that the defendant's Guidelines offense level is 20 and his criminal history category is I. The United States further respectfully requests that, taking into consideration the sentencing factors set forth in section 3553(a), the Court sentence the defendant to 33 months in prison, impose a three-year term of supervised release, and order the defendant to pay a $100 special assessment and $548,428 in restitution, and to forfeit $205,496.68 in proceeds obtained from the offense.

DATED: October 18, 2019

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section

/s/ *James C. Mann*

JAMES C. MANN, Trial Attorney
CA Bar No. 221603
JOHN D. KELLER, Deputy Chief
IL Bar No. 6293104
1331 F Street NW
Washington, DC 20005
(202) 514-1412
(202) 514-3003 (Fax)
James.Mann@usdoj.gov
John.Keller2@usdoj.gov

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff<br><br>v.<br><br>KYLE GERALD PRALL,<br>    a/k/a "Jacob Collins,"<br>    a/k/a "John Holloway,"<br><br>        Defendant | §<br>§<br>§<br>§<br>§  Crim. No. A:19-CR-013 RP<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

### CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of October, 2019, I electronically filed the United States' Sentencing Memorandum, with the Clerk of the Court through the CM/ECF document filing system, which sent notification and copies of the filing to all counsel of record.

                                        /s/ *James C. Mann*
                                        James C. Mann
                                        Trial Attorney
                                        Public Integrity Section