UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Crim. No. 1:19-cr-00013-RP-1 |
| | § | |
| KYLE GERALD PRALL | § | |
| | § | |
| Defendant | § | |

**DEFENDANT KYLE GERALD PRALL'S AMENDED REQUEST FOR VARIANCE AND SENTENCING MEMORANDUM[1]**

A sentence of probation or, alternatively, up to 12 months of imprisonment is appropriate. A sentence should be "sufficient but not greater than necessary" to achieve the objectives of sentencing set forth in 18 U.S.C. § 3553(a)—the touchstone for an appropriate sentence. For the reasons set forth below, Mr. Prall submits that the requested sentence conforms to this standard and Mr. Prall requests that the Court grant his request for a downward variance, recommendation for substance abuse treatment, supervised release, and/or a sentence of probation.

Mr. Prall is now a father to a 6-month old baby girl, Alice. On a very human level, these changed circumstances factor into the length and severity of any sentence that is necessary to fulfill the Congressionally mandated sentencing factors. Further, he is a non-violent offender who does not pose a future threat to society. He has fully accepted and admitted his wrongdoing. He has agreed to make restitution to his victims. And, as evidenced by the substantial number of letters tendered on his behalf, he has exhibited true remorse for his wrongdoings—actions that are not consistent with his true character and future potential.

---

[1] Pursuant to his plea agreement, Mr. Prall requests a variance but does not request a departure.

For example, a letter offered by Mr. Prall's brother, Jeff Prall, demonstrates that "this type of behavior . . . does not represent his character or the person I know." (Letter from Jeff Prall, Character Letter F).[2]  Letter after letter tendered by friends and family on Mr. Prall's behalf demonstrates the same.  The letters further evidence that Mr. Prall has expressed true remorse for his actions to his friends and family, and that with the birth of his daughter, he realizes his "greatest responsibility is as a father and to set a good example of what is right and wrong for [his daughter] as the world is shaped in her tiny mind."  (Letter from Phoebe Wainwright, Character Letter I).

Counsel is aware of only a handful of cases in this country that have charged actions on the particular theories at issue here.  The two cases that have resulted in sentences involved fraud in the millions of dollars—23-50 million dollars in one case and 1.6 million dollars in the other—and resulted in substantial downward variances from the prescribed Guideline levels.  Those cases, which involved substantially more egregious facts and circumstances, indicate that a substantial downward variance is appropriate here.

Specifically, in *United States v. Tierney*, the defendant fraudulently solicited donations via six different political committees and collected over $23 million in fraudulently obtained donations over 3 years and over $50 million in fraudulently obtained donations over 10 years, yet the court sentenced him to only 24 months' imprisonment—a substantial variance from the Guidelines at issue in that case.  Further, Tierney had purposefully limited donations to below the FEC reporting threshold and constantly monitored articles regarding "Scam PACs" to purposely avoid scrutiny from the FEC, journalists, and the public.  By comparison, the fraud at issue here involved approximately 1.1% of

---

[2] Hard copies of 13 separate character letters were provided in conjunction with the filing of this memorandum.  Each reference to a letter herein corresponds with an original letter provided to the Court.  Copies of each letter will also be provided to the government in conjunction with this filing.

the losses at issue in *Tierney* and involved far less egregious facts and harm to society.  Mr. Prall did not exhibit these characteristics.

In another case, *United States v. Taub*, the court sentenced a former campaigner, political strategist, and candidate for office to only 36 months' imprisonment for fraudulently soliciting and collecting over $1.6 million in donations from victims.  Taub's actions were particularly egregious because he used his specific knowledge of the system to further the fraud.  These cases indicate that a substantial downward variance is appropriate with respect to Mr. Prall

In fashioning a sentence, a sentencing court must consider the factors outlined in 18 U.S.C. § 3553(a) and impose a sentence that is "*but not greater than necessary*" to achieve the purposes of sentencing set forth in § 3553(a).  *Gall v. United States*, 552 U.S. 38, 49–50 (2007) (emphasis added); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Booker*, 543 U.S. 220, 245 (2005).  The requests for sentencing set forth herein are sufficient and not greater than necessary when compared to recently decided cases concerning similarly situated defendants.[3]

Post-*Booker* and its progeny, courts have limited the Sentencing Guidelines to the role of a "*rough approximation* of sentences that *might* achieve § 3553(a)'s objectives."  *See e.g., Kimbrough*, 552 U.S. at 89 (emphasis added).  Thus, a court "may not presume that the Guidelines range is reasonable" or appropriate.  *Gall*, 552 U.S. at 50.  Rather, it "must make an *individualized* assessment based on the facts presented," and "[t]he only fact necessary to justify . . . a variance is the sentencing court's disagreement with the guidelines." *Id.*  (emphasis added); *Spears v. United States*, 555 U.S. 261, 264

---

[3] The *Taub* and *Tierney* cases, discussed in depth later, both involved fraudulent political committee activity that involved more significant harm to the public in comparison to Mr. Prall's actions.  Despite an extreme amount of fraud and other distinguishing factors outlined herein, the court sentenced the defendants in *Taub* and *Tierney* to only 36 and 24 months, respectively—a significant variance from the Guidelines in each case.  The *Benton* case—another case that appears in the context of election law violations predicated on fraudulent behavior—also contained aggravating factors not present in this case, but most of the defendants in *Benton* received no prison time.  These cases demonstrate that a variance from the Guidelines here would result in a sufficient sentence that is not disparate with sentences recently imposed on defendants for similar crimes.

(2009) (per curiam) (quoting *United States v. Spears*, 533 F.3d 715, 719 (8th Cir. 2008) (dissenting opinion).

In this context, a downward variance is justified, and a sentence of probation is appropriate, or in the alternative, no more than 12 months of imprisonment.

## I.      THE OFFENSE

Mr. Prall pled guilty to one count of a Mail Fraud, 18 U.S.C. § 1341.

## II.      PRESENTENCE REPORT

The Presentence Report ("PSR") indicates a Total Offense Level of 22, a Criminal History Category of I, a Sentencing Guideline range of 41 to 51 months, and a statutorily authorized maximum sentence of 240 months. The parties agree that restitution in the amount of $548,428 is appropriate. There are two outstanding objections to the PSR.  First, the parties agree, as evidenced by the plea agreement, that the Court should only apply a 10-level enhancement for a loss greater than $150,000 but less than $250,000 pursuant to § 2B1.1(b)(1)(F).  Second, Mr. Prall has objected to the proposed two-level enhancement for misrepresentation regarding a political organization, pursuant to § 2B1.1(b)(9)(A), for the reasons set forth in his objections to the PSR.

## III.      FACTORS UNDER 18 U.S.C. §3553(A)

As established below, the factors outlined in 18 U.S.C. § 3553(a) demonstrate that a sentence below the Guidelines range is appropriate.  These seven factors are (1) the nature and circumstance of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed, (3) the kinds of sentences available, (4) the Sentencing Guidelines, (5) the Guidelines' policy statements, (6) disparity with similar offenders, and (7) the need to provide restitution to the victims of the offense.  18 U.S.C. §3553(a).

1.      **Nature of the Offense and History and Characteristics of the Defendant**

Post-Booker, there is "[n]o limitation . . . on the information concerning the background, character, and conduct of a [defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  With respect to this sentencing factor, one court eloquently noted that:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).

### (a)   History and Characteristics of Mr. Prall

Mr. Prall genuinely understands and regrets his decisions.  His actions are not consistent with the character that Mr. Prall's family and friends—those who know him intimately—have come to expect of him.

Indeed, numerous friends and family confirm that "this is not who he really is" and "this type of behavior is out of the ordinary . . . and does not represent his character or the person that [they] know."  (Letter from Jerry-Dan Charles Klaverweiden, Character Letter D); *See* (Letter from Jeff Prall, Character Letter F).  For example, Mr. Prall has historically helped law enforcement and appreciated the need for justice.  Mr. Prall's prior business venture, "Busted!", "buil[t] and maintain[ed] the infrastructure to send thousands of tips to hundreds of law enforcement agencies across the country over many years" at no cost to law enforcement.  (Letter from Ryan Russel, Character Letter A).  In fact, as demonstrated by one of his character letters, the Austin Police Department has in the past expressed appreciation to Mr. Prall for his and his bussiness' efforts to bring others to justice:

Wanted for Assault/family violence.

Just wanted to let you know that <REDACTED> was arrested as a result of being featured on [your website.]  We received some good tips.  She had 12 warrants and ½ a million in bonds.  She had been on the run for awhile.  Thank you for your partnership.

Veneza Aguinaga #4191
Senior Police Officer
Austin Police Department
Public Information Officer

(Letter from Ryan Russell, Character Letter A).  (excerpt of quote from a letter authored by Ryan Russell, friend and former business partner of Mr. Prall.  The content of this letter was sworn in the presence of a notary).

Mr. Prall is a person who is willing to do anything for anyone.  A decades long friend of Mr. Prall stated that "[Mr. Prall] has always been there for me as a friend and helped me during many difficult times in my life . . . he has helped my father and mother many times, and has supported me during the death of both my sister and mother."  (Letter from Jerry-Dan Charles Klaverweiden, Character Letter D).  Others "have seen how much he has helped others as well, and is generally just a selfless and caring person to family and friends."  *Id.* In summation, many consider it a "a blessing to have [Mr. Prall] as a friend."  (Letter from Todd Reeder, Character Letter L).

Family and friends of Mr. Prall all believe that he truly "understands and regrets his decisions", and "he looks forward to answering for those mistakes and continuing to lead a productive and valuable life."  (Letter from Ryan Russel, Character Letter A).  As part of those mistakes, Mr. Prall has struggled with substance abuse in the past, and he believes that the implementation of a substance abuse treatment program as part of his sentencing will assist with his rehabilitation.  And with the recent birth of his daughter, he understands his "greatest responsibility is as a father and to set a good example of what is right and wrong for [his daughter] as the world is shaped in her tiny mind."  (Letter from Phoebe Wainwright, Character Letter I).  Mr. Prall has fully accepted responsibility for his actions

and wants to answer for the mistakes of his past.  As a result, he humbly requests that the Court consider his family and character in sentencing him.

### (b)      Nature of the Offense

The Addendum and Revised Presentence Investigation Report ("PSR") provides an explanation of the offense, and Mr. Prall agrees with those explanations with the exception of the two-level upward adjustment for the loss amount and a two-level upward adjustment for an offense involving a misrepresentation that the defendant was acting on behalf of a political organization. The offense concerns Mr. Prall's actions related to the 2016 campaign for the Office of the President of the United States, during which Mr. Prall formed political committees that solicited donations.

Without limiting Mr. Prall's full acceptance of responsibility in any way, it is clear that the acts at issue implicate complex areas of law that deserve unique consideration for sentencing.    Perhaps because of this, there have historically been very few prosecutions based upon the theories at issue in this case.  The complexity of the background election and reporting laws, to some degree, gives rise to mitigating circumstances that should be factored into the Court's sentence.  There is also a degree of ambiguity with respect to the proper distinction between acts and funds that may have been violative, on the one hand, and those that may not have been.  For example, both parties agree that certain political education and advocacy materials were produced and published in connection with the activities at issue that were "arguably [for] legitimate political purposes as advertised on the websites."  (Government's Objection to PSR, Exhibit A p. 1). (Printouts of substantial materials reflective of those at issue were tendered as Exhibits A–J of Mr. Prall's Reply to the Government's Response to his Motion to Dismiss (Dkt. No. 24) and are hereby incorporated by reference).

Further, Mr. Prall used a significant portion of the funds to pay for online advertising of the websites, and "although," as the government acknowledges, "this online advertising was likely for the purpose of increasing traffic to defendant's websites . . . it also drove people to the arguably legitimate

educational information about the candidates commissioned by defendant. In sum, it is difficult in this instance to separate the illegitimate expenditures from the legitimate for the purpose of determining 'loss.'"  (Exhibit A, p. 2).  The government clearly does not condone any acts at issue; however, it has, in a very honorable manner, recognized that there may be overlap here between certain, admittedly, improper acts and other acts that may have achieved legitimate ends.  In other words, some of the actions taken and expenditures made by Mr. Prall furthered legitimate ends. This does not in any way take away from the fact that he also engaged in illegal and improper activities. But it reinforces the existence of mitigating circumstances that this Court should consider in fashioning Mr. Prall's sentence.

The Guidelines add further complexity in this context—evidencing mitigating circumstances. The two-level enhancement for misrepresenting the authority to act on behalf of a political organization, pursuant to § 2B1.1(b)(9)(A), should not apply.  While Mr. Prall's actions were indeed illegal, Mr. Prall did not misrepresent his authority to act on behalf of each political organization so as to give rise to the two-level enhancement.  The government effectively confirmed this in its Response to Mr. Prall's Motion to Dismiss:

> The defendant was none of these. Subsection (b) of Section 30124 applies if a person "fraudulently misrepresent[s] the person as speaking, writing, or otherwise acting for or on behalf of any candidate or political party or employee or agent thereof for the purpose of soliciting contributions or donations." 52 U.S.C. § 30124. The defendant is not charged with such misconduct.

(Gov's Resp. to Mot. to Dis., ECF No. 21, ¶¶ 6–7).  This requires a finding that Mr. Prall did not misrepresent that he was acting on behalf of a political organization.  This further demonstrates that mitigating factors exist so as to support the requests for sentencing made herein.

2. **The Need for the Sentence Imposed**

The purposes of sentencing—retribution, general deterrence, specific deterrence, and rehabilitation—justify a sentence below the Guidelines range. *See* 18 U.S.C. § 3553(a)(2).

Under 18 U.S.C. § 3553(a)(2), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The Supreme Court has held that even a sentence of probation should not be considered a lenient sentence, as it carries with it substantial restrictions of liberty. *Gall*, 552 U.S. at 44, 48.

As one court recently noted: "Not all defendants must be sentenced to imprisonment to be duly punished." *United States v. Coughlin*, 2008 BL 301746 (W.D. Ark. Feb. 01, 2008) on remand from *United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007) (imposing a sentence of five years' probation upon former Chief Operating Officer, Executive Vice President and Vice Chairmen of the Board of Directors of Wal-Mart Stores, Inc., who pled guilty to five felony counts of aiding and abetting wire fraud and one felony count of filing false tax returns, where guidelines range was 27 to 33 months). Indeed, courts have recognized that "[h]ome detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive." *United States v. Coughlin*, 2008 BL 301746 (W.D. Ark. Feb. 01, 2008) on remand from *United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007). Such "punishment is far from an act of leniency, and its characterization as such deprives sentencing courts of a valuable and effective form of punishment." *Id.* Particularly in a case like this, where Mr. Prall has demonstrated remorse for his actions and has dedicated to provide a positive example for his newborn daughter, a sentence of incarceration is not necessary to accomplish the goal of retribution.

In this case, general deterrence will be served through the proposed sentence and variance. General deterrence aims to deter others from crime. As already agreed between the parties, full restitution will ultimately be made to the victims in this case. This demonstrates to the public at large

that the proceeds of any fraud from similar conduct will be discovered and returned to the victims—deterring any would-be offenders from participating in a similar scheme.

Further, empirical and analytical studies have found that "White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."  Richard S. Frase, *Punishment Purposes*, 58 STAN. L. REV. 67, 80 (2005).  Other research regarding white collar offenders has found that there is no difference in the deterrent effect of probation and that of imprisonment.  *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995).  Indeed, "there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."  Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007). Particularly against this background, the goals of general deterrence would be satisfied by imposing probation, supervised release, and submission to a substance abuse treatment program.

Specific deterrence will also be served through the proposed sentence and variance.  Mr. Prall has fully accepted responsibility for his actions, expressed remorse his actions, and agreed to make full restitution.  All of the character letters provided by family and friends of Mr. Prall agree that the birth of his daughter this year, and recent marriage to his wife, have solidified a need to put his life on a better path and avoid any semblance of illegal conduct in the future.  Imposing any sentence above

the proposed sentence and variance would not be necessary so as to further deter Mr. Prall from illegal conduct in the future.

### 3.      The Kinds of Sentences Available

The Court may consider a wide range of alternatives to imprisonment in order to fashion a just sentence, including probation.  Section 3553(a)(3) even "directs the judge to consider sentences other than imprisonment."  *Gall*, 552 U.S. at 59.  Indeed,

> [i]n some cases, the sentence suggested by the Guidelines is not appropriate, as one size cannot be said to fit all.  No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience.  While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula.

*United States v. Coughlin*, 2008 BL 301746, *8 (W.D. Ark. Feb. 01, 2008) on remand from *United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007).

The Supreme Court has recognized that probation can be an appropriate sentence even where the Guidelines range is significant.   *See Gall*, 552 U.S. at 59-60 (affirming sentence of 36 months probation where Guidelines sentence range was 30 to 37 months imprisonment).   Indeed, it is noteworthy that in *Gall*, both the district court and the Supreme Court recognized that a sentence of probation carries with it a substantial restriction of freedom, as probationers are typically subject to many conditions and restrictions.  *Gall*, 552 U.S. at 44, 48-49.

Many courts have recognized that probation can be appropriate even where the Guidelines may prescribe a substantial period of incarceration.[4]  Against this background, probation should not

---

[4] *See, e.g., United States v. Dubon*, 541 F.3d 391, 394-95 (5th Cir. 2008) (affirming a sentence of 60 months probation where the Guidelines sentence range was 27 to 33 months); *United States v. Coughlin*, 2008 BL 301746 (W.D. Ark. Feb. 01, 2008) on remand from *United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007) (imposing a sentence of five years' probation upon former Chief Operating Officer, Executive Vice President and Vice Chairman of the Board of Directors of Wal-Mart Stores, Inc., who pled guilty to five felony counts of aiding and abetting wire fraud and one felony count of filing false tax returns, where guidelines range was 27 to 33 months); *United States v. Cole*, 721 F.3d 1016 (8th Cir. Aug. 6, 2013), 765 F.3d 884 (8th Cir. 2014) (three-year probation sentence where guideline range was 135 to 168 months against defendant who was convicted by jury of conspiracy to commit mail and wire fraud, tax evasion and conspiracy to commit tax fraud

be viewed as a lenient sentence. Such "punishment is," in fact, "far from an act of leniency, and its characterization as such deprives sentencing courts of a valuable and effective form of punishment." *United States v. Coughlin*, 2008 BL 301746 (W.D. Ark. Feb. 01, 2008) on remand from *United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007).[5] Indeed, the U.S. Sentencing Commission itself has recognized this in recent years: "The [Sentencing Reform] Act established probation as an actual sentencing option, rather than an instrument used in suspending prison sentences."

Indeed, such sentences find much support in congressional policy objectives—particularly where the defendant is a non-violent, first-time offender who does not pose a dangerous threat to society.  Congress has stated that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose

---

stemming from company's theft of nearly $33 million and understating tax liability by more than $3 million, remanded for fuller explanation of sentence); *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) (affirming sentence of six months of home monitoring, three years of probation, and 1,000 hours of community service following a sixteen-day jury trial, where both defendants were convicted of, among other things, conspiracy to defraud the United States and eighty-three counts of making, and aiding and abetting the making of a false statement on a highway project, where the court found the loss applicable each was $5.2 million, and where the guideline offense level was 29, which equated to a guidelines sentencing range of 87 – 108 months incarceration); *United States v. Ervin*, 2012 BL 134616 (M.D. Ala. May 30, 2012) (sentence of five-year probationary term and special condition that defendant serve 40 consecutive weekends of incarceration where defendant was convicted of tax evasion, conspiracy to defraud the United States, and structuring to evade a currency-transaction reporting requirement and where the guideline range was 63 to 78 months); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming sentence of 5 years probation in false tax return case where Guidelines sentence range was 10 to 16 months imprisonment); *United States v. Tomko*, 562 F.3d 558, 561, 563 (3d Cir. 2009) (en banc) (affirming probation, community service, and restitution for defendant in Zone D charged with tax evasion); *United States v. Moore*, 104 A.F.T.R. 2d 2009-6358, 6360 (3d Cir. 2009) (affirming probationary sentence where Guidelines sentence range was 18 to 24 months imprisonment); *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming sentence of two years probation and three months home confinement for Zone D defendant convicted of two counts of wire fraud); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (per curiam) (affirming sentence of probation and no imprisonment where jury found white-collar defendant guilty of pirating over $1 million of satellite television access cards and where the Sentencing Guidelines recommended 41 to 51 months' incarceration); *United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008) (affirming sentence of one day imprisonment and probation upon defendant charged with health care fraud, embezzlement and money laundering where the Sentencing Guidelines recommended 30 to 37 months' incarceration).

[5] Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).  *See also Alternative Sentencing in the Federal Criminal Justice System*, United States Sentencing Commission, Jan. 2009, p. 2; Carew, Marla, *Discretion and Deterrence in Tax Sentencing After Rita, Gall and Kimbrough—Opportunities for Alternative Sentences and Potential Abuses*, 9 FLA. TAX REV. 919, 956 (2011) (citing Kate Stith and Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223 (1993) ("A congressional policy preference for sentencing alternatives to strict incarceration is found, though often forgotten, in the 1970s and 1980s legislative histories of Senate Acts predating the SRA, in which promotion of alternative sentences was, for a short time, a widely discussed and viable goal of uniform sentencing.").

the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

Neither counsel nor Mr. Prall seeks in any way to diminish the gravity of the instant offense. But Mr. Prall submits that a sentence of probation, supervised release, and imposition of a substance abuse program as terms of his release will satisfy the goals of sentencing as defined in 18 U.S.C. §3553(a).

**4. & 5. The Sentencing Guidelines and Policy Statements**

A sentence of supervised release, recommendation for participation in a substance abuse treatment program, and/or probation will adequately reflect the purposes of sentencing. Section 3553(a)(5) specifically directs a court to consider relevant policy statements. The Commission has recognized the importance of a defendant's responsibilities to his or her family in determining proper sentencing. USSG § 5H1.6, Policy Statement. The policy statements therefore serve as a basis for a variance from the Guidelines. *See* 18 U.S.C. § 3553(a)(5).[6] As such, a variance from the guidelines may be warranted when:

(i)     The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for

---

[6] Mr. Prall seeks only a downward *variance* from the Guidelines. Pursuant to his plea agreement, Mr. Prall has agreed to not seek a departure. (Plea Agr., ECF No. 27 ¶ 3(b)).

            [variance] because such hardship or suffering is of a sort ordinarily incident to incarceration.

      (iii)     The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

      (iv)     The [variance] effectively will address the loss of caretaking or financial support.

USSG § 5H1.6, Policy Statement.

Mr. Prall celebrated the birth of his daughter just a few months ago. His family has no other source of income aside from Mr. Prall. The loss of Mr. Prall's caretaking and financial support, particularly given the birth of his newborn baby, substantially exceeds the harm normally incident to incarceration for a similarly situated defendant and would cause direct, substantial loss of essential caretaking and financial support to Mr. Prall's family. Further, a variance from the Guidelines, namely supervised released and/or probation, would fully address the loss of caretaking and financial support. These factors support the requested sentence.

### 6. Unwarranted Disparity with Similar Offenders

A downward variance from the Guidelines sentence range would not create a disparity with similar offenders; it would, in fact, promote uniformity when compared to several highly relevant, similar offenders/sentences. Indeed, in 2018, courts across the country imposed a sentence on a defendant convicted of fraud/theft/embezzlement that varied from the Guidelines' range 34.8% of the time. *See* U.S.S.G., *Statistical Information Packet Fiscal Year 2018*, Table 10 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/tx18.pdf). In other words, courts frequently sentence defendants outside the range recommended by the Guidelines. The relevant cases are consistent with this statistic. It is important to note that there are only a handful of cases dealing with the particular conduct at

issue here and charging the theories at issue here—each case indicates that a substantial variance from the guidelines is appropriate in this circumstance.

In *United States v. Taub*, the defendant was sentenced to thirty-sixth months imprisonment for pleading guilty to two counts: one count of wire fraud and one count of a willful violation of the Federal Election Campaign Act in violation of 52 U.S.C. §§ 30104 and 30109. (Judg. in *Taub*, Exhibit B p. 1–2). Taub was a "former campaigner, political strategist, and former candidate for office" who "relied on his knowledge of fundraising and political strategy . . . to further his fraud and develop a fundraising strategy around them." (Gov's Memo in *Taub*, Exhibit C p. 12-13). Leveraging this "insider status," Taub fraudulently solicited over 1.6 million dollars in donations and converted over a million dollars of those donations to his personal use. Taub fraudulently obtained 1.2 million of the 1.6 million from a single married couple—causing particular harm to the couple. (Exhibit C p. 14). He never registered the political committees with the FEC as required by law, and Taub further made illegal campaign contributions. Despite this, the Court made a significant downward variance from the Guidelines sentencing Taub to thirty-six months imprisonment. (Exhibit C p. 15); (Exhibit B).

The harm caused to the public in *Taub* was far more significant in comparison to the case at issue. In comparison to Taub, Mr. Prall raised less than half of the number of funds that Taub received *from only one victim*; converted less than half of the amount of funds to direct, personal use; and, unlike Taub, properly registered each political committee with the FEC. Further, the violation of the Federal Election Campaign Act (52 U.S.C. §§ 30104 and 30109) in *Taub* required a heightened element of willfulness, which increases the significance and egregiousness of Taub's violations. Indeed, Taub had used his experience as a former campaigner, strategist, and candidate for office to further the fraud— factors that add to the egregiousness of his violation. *See* 52 U.S.C. § 30109. These factors all

distinguish *Taub* and indicate that a sentence much lower than Taub's (and in no case more than Taub's) is appropriate.

In *United States v. Tierney*, the court sentenced the defendant to only twenty-four months' imprisonment and one-year supervised release for fraudulently soliciting and collecting donations from tens of thousands of donors via six different political committees—including committees purportedly representing "autism awareness" and "law enforcement appreciation." *See* Sealed Compl. in *Tierney*, (Exhibit D ¶¶ 11–12); *See* (Judg. in *Tierney*, Exhibit E pp. 1–2). Tierney had fraudulently raised over 23 million dollars in 3 years, and *over 50 million dollars in 10 years*. (Exhibit D ¶ 11). Tierney purposely solicited and received small donations under $200 below the FEC threshold for itemized disclosure requirements in order to deliberately avoid FEC scrutiny. (Exhibit D ¶ 12). In fact, Tierney "undertook efforts to avoid press coverage of the Scam PACs . . . [and] monitored media articles about fraudulent PACs, including in connection with evaluating whether to increase their de minimis political donations to avoid the suspicion of journalists." (Exhibit D ¶ 12). Mr. Prall collected funds on a level that was magnitudes less (1.1% of Tierney's total) and did not attempt to avoid scrutiny by only accepting donations below the $200 reporting threshold. Indeed, there is no evidence to demonstrate that Mr. Prall undertook efforts "to avoid press coverage," that he monitored articles regarding scam political committees, or that he manipulated donation totals through the de minimus threshold purely to avoid suspicion of journalists.

Mr. Prall collected $548,428 in donations, and a sizeable portion of those donations went towards arguably legitimate ends. *See* (Exhibit A). In comparison, Tierney collected over $50 million in donations and Taub collected over $1.6 million in donations. Even assuming every dollar collected

by Mr. Prall went towards illegitimate ends, the total collected by Mr. Prall was only 1.1% and 38.3% of each respective total.  Mr. Prall's conduct was magnitudes less egregious than Taub or Tierney.

Another recent case sheds light on the proper sentence.  A jury recently convicted three defendants, Dimitrios Kesari, Jesse R. Benton, and John Frederick Tate, in connection with a political committee finance scheme involving a former Iowa Senator.  *United States v. Benton*, 890 F.3d 697, 703-04 (8th Cir. 2018).  In that case, former Iowa State Senator Kent Sorenson initially supported one candidate in the 2012 presidential election, but between October and December 2011, negotiated with the defendants, as senior leadership of a campaign for a candidate in the 2012 presidential election, to switch his support to the political committee's candidate in exchange for money.  *Id.* at 704–07.  Evidence at trial proved that the defendants concealed over $70,000 in illegal payments made to Sorenson by recording each payment—both in campaign accounting records and in FEC filings—as campaign-related audio-visual expenditures, and by pushing the payments through to a film production company and then to a second company that Sorenson controlled.  *Id.*  The defendants effectively concealed the political committee's payments to Sorenson from the FEC, FBI, and the public.  Despite this, Kesari was sentenced to three months prison time and two years of probation. (Judg. in *Benton*, Exhibit F p. 1–2).  Benton was sentenced to only two years of probation.  (Judg. in *Benton*, Exhibit G p. 1–2).  Tate was also sentenced to only two years of probation.  (Judg. in *Benton*, Exhibit H p. 1–2).  The offense in this case directly involved bribing a public official, but most of the defendants served no prison time.  Mr. Prall's conduct did not involve bribing a public official but did involve a similar scheme of fraud.

Indeed, it is also notable that many FEC-related violations are resolved through civil proceedings and sanctions.  As such, these FEC civil proceedings provide an insightful body of precedent that helps to inform the unwarranted-disparity analysis. Such FEC civil cases also demonstrate the ambiguities present in cases involving political committees.  *See, e.g., Charles Boustany,*

*Jr. MD for Congress, Inc., et al.*, FEC MUR 6698 (Feb. 25, 2016) (declining to pursue a civil action despite an allegation that the expenditure was incorrectly labeled as "door- to-door GOTV" to conceal the campaign's affiliation with a Democratic firm); *Kirk for Senate*, FEC MUR 6510 (July 16, 2013) (no violation where complaint that a campaign misreported payments as "advertising" when they were transferred to the candidate's girlfriend to cover the cost of yoga lessons and other personal expenses); *Ready for Hillary PAC*, FEC MUR 6775 (Feb. 11, 2016) (noting that the description of an expenditure for the rental of a candidate's email list as "online advertising" was not actionable because "the committee does not have an obligation to identify the payment specifically as a 'list rental'").

For example, in 2013, the FEC investigated U.S. Senator Mark Kirk's campaign committee and its treasurer. *Kirk for Senate*, FEC MUR 6510 (July 16, 2013). Senator Kirk's campaign had allegedly disguised payments to his girlfriend, for yoga and other personal expenses, by disguising payment through a third-party vendor. *Id.* In its opinion, the FEC focused solely on whether the campaign should have reported payments that ultimately ended up in his girlfriend's pocket. The FEC held that the Kirk campaign had accurately reported the identity of the third-party as the payee, even though the payments ultimately went to Kirk's girlfriend. *Id.* The FEC has long advised that committee treasurers need only report the name of the person or entity that campaigns pay directly. FEC Advisory Opinion 1983-25 (*Mondale for President*, 1983 WL 909270, at *2 (DCD. 91-3); *see also Reporting Ultimate Payees of Political Committee Disbursements*, 78 Fed. Reg. 40625-03, 40626 (July 8, 2013). As a result, the FEC found no violation even though the payments to his girlfriend were arguably improper. *See Kirk for Senate*, FEC MUR 6510 (July 16, 2013).

In another case, the FEC failed to find a violation of the Federal Election Campaign Act in *Patriot Super PAC* even though the political committee at issue there "spent many thousands of dollars to compensate its officers, whether directly via consulting fees or other benefits, or by funneling

business to [the political committees organizer's] other ventures in fundraising and communications media." F&A, MUR 6643 (Patriot Super PAC, *et. al.*), pp. 6-7.   Another FEC complaint failed to find a violation of the Federal Campaign Act when a political committee paid over $100,000 to the committee's executive director for "legal services" and "office rent"  and over $80,000 to the committee's treasurer for "accounting services," "management services," "medical insurance," "salary." F&LA, MUR 6633 (Republican Majority Campaign PAC, *et al.*), pp. 6-7.  Such civil cases, at minimum, demonstrate the ambiguity present in this area of law.  The Court should consider this ambiguity as a mitigating factor in determining the appropriate sentence for Mr. Prall.

### (a) <u>Other Comparable Cases Indicate that Probation Would Not Create a Disparity</u>

Other examples of probationary sentences handed down in non-violent, white-collar cases further demonstrate that a sentence of probation would not create a disparity with similar offenders. In a case involving the prosecution of "white-collar" crimes, the First Circuit upheld a non-custodial sentence of probation and home confinement against defendants that exhibited far greater culpability than that attributable to Mr. Prall here.  *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012). In *Prosperi*, the defendants, Prosperi and Stevenson, were charged with one count of conspiracy to commit mail fraud and make false statements; one count of conspiracy to defraud the United States by submitting false claims; eighty-three counts of making, and aiding and abetting the making of a false statement on a highway project; and fifty counts of mail fraud, and aiding and abetting mail fraud.  *Id.* at 37. The district court determined that both Prosperi and Stevenson were organizers/leaders in the criminal scheme and determined that the loss amount attributable to each was $5.2 million.  *Id.* at 39. The resultant guideline offense level was 29 and, the court found, equated to a guidelines sentencing range of 87–108 months incarceration.  *Id.*

Following a sixteen-day jury trial, both were convicted on all counts.  *Id.*  The court sentenced Prosperi and Stevenson to six months of home monitoring, three years of probation, and 1,000 hours

of community service.  *Id.* at 41 (stating that, "It is tempting but ultimately, I think, an abuse of my power as a sentencing judge to hold these defendants responsible for all of the excesses of modern corporate ills."  "I think [the defendants' conduct] was wrong," but I really cannot sentence a culture. I have to sentence the defendants as human beings.").

In another case, *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (per curiam), the Ninth Circuit affirmed a sentence of probation and no imprisonment where the jury found a white-collar defendant guilty of pirating over $1 million worth of counterfeit "access cards" that enabled his customers to improperly access satellite television.  The district court calculated the guidelines range as 41 to 51 months, but instead varied and imposed a sentence of probation along with community service and restitution.  The circuit court found no error with the district court's determination that such a sentence was "more appropriate than prison."  *Id.* at 993.

In another white-collar case, the Third Circuit affirmed a sentence of two years' probation, despite a guideline range of 18 to 24 months, where the defendant was convicted of wire fraud by a jury.  *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008).  The defendant's company contracted with the Air Force to supply twenty embeddable computer encryption modules to the United States Air Force Base at Ali Al Salem in Kuwait to be used to encrypt national security information transmitted among networked military computers.  *Id.* at 130.  To obtain payment on the contract, the defendant's company was required to submit a proof of delivery to the Air Force.  In fact, the defendant never purchased or delivered the devices, but he still submitted or caused to be submitted an altered bill of lading, falsely indicating that the devices had been delivered.  The Air Force paid the defendant and later, after it initiated an investigation to locate the modules, the defendant "engaged in a sustained effort to obstruct the investigation in order to hide his crime"  and "[d]uring the subsequent investigation, [the defendant] continued to make several untruthful statements regarding the

purported transaction." *Id.* at 128, 130-31.  Even on these facts, the district court sentenced the defendant to a term of two years' probation.

As these cases and others demonstrate[7], the sentence requested by Mr. Prall would not create an unwarranted disparity.

### 7. Restitution

As a result of Mr. Prall's execution of the plea agreement, the victims in this case will ultimately be made whole.  These parties worked in close cooperation and collaboratively to ensure that that the victims would be compensated for the harm caused by Mr. Prall.  The plea agreement further reflects his full acceptance of responsibility.  Sentencing Mr. Prall to probation or supervised release will allow

---

[7] *See, e.g., United States v. Duhon*, 541 F.3d 391, 394-95 (5th Cir. 2008) (affirming a sentence of 60 months probation where the Guidelines sentence range was 27 to 33 months); *United States v. Coughlin*, 2008 BL 301746 (W.D. Ark. Feb. 01, 2008) on remand from *United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007) (imposing a sentence of five years' probation upon former Chief Operating Officer, Executive Vice President and Vice Chairman of the Board of Directors of Wal-Mart Stores, Inc., who pled guilty to five felony counts of aiding and abetting wire fraud and one felony count of filing false tax returns, where guidelines range was 27 to 33 months); *United States v. Cole*, 721 F.3d 1016 (8th Cir. Aug. 6, 2013), 765 F.3d 884 (8th Cir. 2014) (three-year probation sentence where guideline range was 135 to 168 months against defendant who was convicted by jury of conspiracy to commit mail and wire fraud, tax evasion and conspiracy to commit tax fraud stemming from company's theft of nearly $33 million and understating tax liability by more than $3 million, remanded for fuller explanation of sentence); *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) (affirming sentence of six months of home monitoring, three years of probation, and 1,000 hours of community service following a sixteen-day jury trial, where both defendants were convicted of, among other things, conspiracy to defraud the United States and eighty-three counts of making, and aiding and abetting the making of a false statement on a highway project, where the court found the loss applicable each was $5.2 million, and where the guideline offense level was 29, which equated to a guidelines sentencing range of 87 – 108 months incarceration); *United States v. Ervin*, 2012 BL 134616 (M.D. Ala. May 30, 2012) (sentence of five-year probationary term and special condition that defendant serve 40 consecutive weekends of incarceration where defendant was convicted of tax evasion, conspiracy to defraud the United States, and structuring to evade a currency-transaction reporting requirement and where the guideline range was 63 to 78 months); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming sentence of 5 years probation in false tax return case where Guidelines sentence range was 10 to 16 months imprisonment); *United States v. Tomko*, 562 F.3d 558, 561, 563 (3d Cir. 2009) (en banc) (affirming probation, community service, and restitution for defendant in Zone D charged with tax evasion); *United States v. Moore*, 104 A.F.T.R. 2d 2009-6358, 6360 (3d Cir. 2009) (affirming probationary sentence where Guidelines sentence range was 18 to 24 months imprisonment); *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming sentence of two years probation and three months home confinement for Zone D defendant convicted of two counts of wire fraud); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (per curiam) (affirming sentence of probation and no imprisonment where jury found white-collar defendant guilty of pirating over $1 million of satellite television access cards and where the Sentencing Guidelines recommended 41 to 51 months' incarceration); *United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008) (affirming sentence of one day imprisonment and probation upon defendant charged with health care fraud, embezzlement and money laundering where the Sentencing Guidelines recommended 30 to 37 months' incarceration).

Mr. Prall to continue managing his legal business activities, which further ensures that the victims are fully compensated for the harm he caused.

**IV.   CONCLUSION**

For all of the reasons set forth above, Mr. Prall respectfully requests that this Court grant a variance below the Guidelines range.

Respectfully submitted,

By: /s/ Jason Freeman
Jason B. Freeman
TX Bar # 24069736
Ryan C. Dean (admitted *pro hac vice*)
TX Bar # 24109798
Freeman Law, PLLC
2595 Dallas Parkway, Suite 420
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw-pllc.com

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I, Jason B. Freeman, certify that on the 22nd day of October, 2019, a copy of the foregoing was served on the all Counsel of Record via the Court's Electronic-Filing System.

/s/ Jason Freeman