**EXHIBIT C**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CASE NO. 19-CR-00015 |
| v. | § | |
| | § | |
| HAROLD RUSSELL TAUB | § | |

## UNITED STATES' MEMORANDUM ON SENTENCING

The United States of America, by and through undersigned counsel, respectfully submits this sentencing memorandum to aid in the Court's determination of the appropriate sentence for the defendant, Harold Russell Taub. For the reasons stated herein, the government respectfully submits that this Court should impose a sentence of incarceration at the low end of the advisory guidelines range, as ultimately determined by the Court, followed by a period of supervised release, and order full restitution to all victims, in the amount of $1,102,439.

### I.     INTRODUCTION

Over the course of two years, the defendant engaged in a sophisticated scheme to defraud his victims by falsely representing to them that he had created two political action committees to support Republican candidates and causes. He falsely represented that "100%" of all donations would go to supporting these causes and that all committee staff were volunteers. In truth, there were no such committees and the defendant used the majority of the donations to fund his own political ambitions by making donations in his own name, attending political fundraisers, and spending tens of thousands of dollars on travel, entertaining, dining, cigars, and adult entertainment. Over the two years of his scheme, the defendant obtained more than $1.6 million through his scheme and converted over $1 million to his personal use. In doing so, the defendant preyed on people who trusted him due to his prior status as the Republican candidate for the Rhode Island congressional seat in 2016 and his false assumption of the identity of a former Ambassador

and high level military officer. The defendant's scheme also manipulated people who simply sought to exercise one of the most fundamental rights a citizen has—to participate in the political process—and he did so for nothing more than personal gain. He undermined the political process, weakened individuals' faith in democracy, and choose to benefit himself at every turn.

In purporting to operate these two fraudulent political committees, Keeping America in Republican Control ("KAIRC") and Keeping Ohio in Republican Control ("KOIRC"), the defendant also willfully violated the Federal Election Campaign Act ("FECA") by soliciting funds from donors and failing to report these funds to the Federal Election Commission ("FEC").

The Presentence Investigation Report ("PSR") has calculated a combined offense level of 22, after the three-level downward departure for acceptance of responsibility. The government requests that this Court also add two levels to the offense level because of the defendant's use of sophisticated means, pursuant to Section 2B1.1(b)(10) of the United States Sentencing Guidelines Manual ("USSG," or "Guidelines"), as is discussed further below. Once the court has calculated the advisory guidelines range, the government requests that the Court impose a sentence of incarceration at the low end of the applicable range as found by the Court, to be followed by a period of supervised release, and full restitution in the amount of $1,102,439. Given the amount of restitution, the United States does not seek the imposition of a fine.

## II. BACKGROUND

On March 21, 2019, the defendant pleaded guilty to Count 1 and Count 2 of an Information, which charged him with one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of willfully violating FECA, in violation of 52 U.S.C. §§ 30104(a) and 30109(d)(1)(A). Plea Agmt. [Dkt. 2] at ¶ 1. As part of his plea agreement, the defendant admitted to his criminal conduct through a detailed factual basis, which has been incorporated into the PSR.

From approximately December 2016 to approximately November 2018, the defendant knowingly developed a scheme to defraud and to obtain money from the general public by soliciting contributions for fraudulent political committees,[1] including KAIRC and KOIRC. Information [Dkt. 1] at ¶¶ 9, 17. KAIRC was created in or about December 2016 and was represented to be a legitimate political committee, organized in order to support Republican candidates at the state and federal level. *Id*. ¶ 11. The defendant also created a website, www.kaircpac.com, which had a links to the "Federal PAC" and "State PAC." *Id*. ¶ 12, 15. The KAIRC website allowed individuals to submit donations ranging from $25 to over $1,000 via a separate, online fundraising platform. *Id*. ¶ 16. Statements and disclaimers on the website misrepresented to the public that KAIRC was complying with federal law. *Id*. ¶ 16. In reality, KAIRC was not registered with the FEC and did not comply with the FECA's reporting requirements for political committees. *Id*. ¶ 13.

In our about March 2018, the defendant founded KOIRC. *Id*. ¶ 12. KOIRC was also represented to its donors to be a legitimate political committee, organized to support Republican candidates in Ohio. *Id*. ¶ 12. Like KAIRC, it was not registered with the FEC, and did not comply with the requirements of FECA. *Id*. ¶ 13.

In addition to the defendant's online fundraising efforts, the defendant also solicited donations from individuals by mail, email, and through social media. *Id*. ¶ 17. In these solicitations, the defendant told donors that "100%" of the money contributed would be used to support candidates for office, and that all of the people who worked for the committees were volunteers. *Id*. ¶ 9.

---

[1] Political Committees or "PACs" refers to a committee that can contribute to other federal political committees, including candidate committees. Independent-expenditure-only committees (also known as "Super PAC") may accept unlimited contributions, but may not contribute to candidates or candidate committees.

3

The defendant further augmented his fraud with identity theft, telling donors that Person A, a former Ambassador and high-level military officer, was involved with KAIRC and KOIRC to further his fraudulent representations and induce select individuals to donate, without Person A's knowledge or permission. *Id.* ¶ 18. Using Person A's name gave credibility to the defendant's solicitations and helped him secure additional funding for KAIRC under false pretenses. *Id.* In or about July 2018, Person A, through legal counsel, sent a cease and desist notification to the defendant, instructing the defendant to stop using Person A's name in his solicitations, as Person A had not authorized such use. *Id.* The defendant promptly acknowledged the notification and agreed to cease using Person A's name for solicitation purposes. *Id.* Nevertheless, the defendant continued to use Person A's name in solicitations through in or about November 2018. *Id.*

The defendant represented KAIRC and KOIRC to be Super PACs to select donors, and he treated both as Super PACs, in that he accepted donations greater than the $5,000 limit on donations to PACs imposed by the FECA. However, the defendant also sent more than $215,000 in donations directly from KAIRC and KOIRC to the campaign committees of federal candidates, which is prohibited for a Super PAC to do under the FECA. *Id.* ¶ 19.

Two donors, a married couple, contributed the largest amount to KAIRC and KOIRC, contributing a total of $1,275,000 to the two entities. *Id.* ¶ 21. In total, the defendant received $1,630,439 in contributions to KAIRC and KOIRC from hundreds of donors. *Id.* ¶ 20. Over 160 individuals contributed $1,126,114 to KAIRC, and six individuals from that group contributed over $500,000 to KOIRC alone. *Id.* The defendant then used the funds contributed to KAIRC and KOIRC to cover personal expenses, paying himself substantial amounts of money as the sole employee of either PAC, *id.* ¶¶ 9, 13, and spending tens of thousands of PAC dollars on domestic

and international travel, hotels, restaurants, and clothing; as well as cigars, adult entertainment, and escort services. *Id.* ¶ 22.

### III. CALCULATION OF THE ADVISORY GUIDELINES RANGE

The presentence report correctly calculates that the base offense level is 7, pursuant to USSG § 2B1.1. Presentence Report (PSR) at 8. The report further accurately adds 14 levels because the loss resulting from the defendant's conduct, $1,102,439, was between $550,000 and $1,500,000. *Id.* The report correctly adds two additional levels pursuant to § 2B1.1(b)(1)(H) because there were more than 10 victims. *Id.* The two-level enhancement applied pursuant to USSG § 2B1.1(b)(9)(A), is addressed below. Further, the United States respectfully submits that two additional levels should be added, pursuant to USSG § 2B1.1(b)(10), because the defendant's fraud employed sophisticated means, as discussed addressed below.

#### A. Motion for Credit for Acceptance of Responsibility

Pursuant to §§ 3E1.1(a) and 3E1.1(b), the PSR contemplates a three-level downward adjustment for the defendant's acceptance of responsibility for his conduct, based on his admission to the elements of the offense, and his assistance with the investigation and prosecution of his misconduct by timely notifying the United States with his intention to plead. The United States anticipates that it will make the motion for an additional one-level reduction in the offense level at sentencing, pursuant to § 3E1.1(b).

#### B. The Sophisticated Means Enhancement is Appropriate

The defendant's scheme was multi-faceted and complex. He held himself out as operating more than one political action committees, opened separate bank accounts not only for the two fictitious PACs described in the Information, but also for six other entities that also appear from the investigation to have no legitimate business. He transferred money in between these accounts,

5

and used them all as his own. The defendant diversified his scheme, sending solicitations by mail, email, and social media. Furthermore, the defendant repeatedly used the name of a former Secretary of the Navy and Ambassador in his solicitations. In doing so, the defendant not only falsely represented that this person, Person A, was involved in and supported the defendant's false PACs, the defendant sent solicitations purportedly from Person A, and send books and other gifts purportedly signed by Person A.

  The Guidelines provide that two levels should be added to the base offense level if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." USSG § 2B1.1(b)(10). The application notes to the Guidelines commentary defines "sophisticated means" as: "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1 note 9(B). The application notes provide an example of sophisticated means: "[f]or example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." *Id*. The application notes further state that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id*.

  The defendant's fraud contained many of the elements listed in the application notes. Although neither of the fraudulent PACs existed, his base of operations was his apartment in Rhode Island, and he directed solicitations by mail, email, and social media all over the country. He used two fictitious entities to solicit donations, the latter of which was "created" when an Ohio-based donor began giving the defendant large donations. PSR at 5-6. Furthermore, the defendant moved the money he collected from his fraudulent solicitations among ten different bank accounts—two

in his name and eight in the names of other fictitious entities. PSR at 7. The defendant's sentencing memo glosses over the defendant's aggravated identity fraud perpetrated in furtherance of his fraud. The defendant deliberately used the name of Person A, knowing that Person A was well-known and influential in both political and military circles, to bolster his fraudulent efforts. All in all, the defendant's scheme involved multiple moving parts as he built up relationships with donors on the basis of his alleged relationship with Person A and Person A's supposed involvement with KAIRC and KOIRC. This was not "a garden-variety offense," as the defendant suggests, and there were, contrary of the defendant's assertion, "efforts to hide assets or transactions." Def.'s Sentencing Mem. [Dkt. 18] at 18.

Even if the defendant had not engaged in conduct specifically listed in the Guidelines' application notes, that fact would not prevent the application of the sophisticated means enhancement, which provides an illustrative, but not exhaustive list of conduct that constitutes sophisticated means. In *United States v. Pacheco-Martinez*, the First Circuit held that a defendant "need not have done any of the things listed in order to qualify for the [sophisticated means] enhancement, so long as the offense as a whole shows 'a greater level of planning or concealment' than a typical fraud of its kind.'" 791 F.3d 171, 177 (1st Cir. 2015) (internal citations and quotation marks omitted). This is consistent across recent First Circuit cases. For example, in *United States v. Foley*, the First Circuit held that "the enumerated examples [in the Guidelines] are by no means exhaustive, and as other circuits have recognized 'the enhancement properly applies to conduct less sophisticated' than the examples." 783 F.3d 7, 25 (1st Cir. 2015) (internal citations omitted).

The defendant argues at length that each individual attribute of his scheme does not alone meet the criteria for sophisticated means. Even if that were true, it misses the point that the scheme must be viewed in its entirety, not as a collection of separate fraudulent acts. Those acts combine

7

together to form an intricate and sophisticated scheme that effectively defrauded hundreds of sophisticated donors.

The defendant further argues that "the fact that Russell never registered the PACs or filed any reports with the FEC lend further support to the idea that his scheme lacked sophistication." Def.'s Sentencing Mem. at 23. To the contrary, the fact that the defendant did not register with the FEC made it harder to detect his wire fraud scheme. Registration would have required that the defendant disclose donations and expenditures. Further, it would have revealed, relevant to the FECA charge, that the defendant was accepting donations as if he operated a Super PAC but spending as if he was a PAC. It also would have revealed the hundreds of thousands of dollars in personal expenses. The use of purported political committees, but the willful failure to file the required FEC paperwork by a person who well knew what was required to be filed, show increased, not decreased, sophistication.

### C. The Political Organization Enhancement.

The defendant is correct that the parties came to an agreement as to the mutual understanding of the applicable sentencing guidelines range, as reflected in the plea agreement, and that agreed understanding of the applicable guidelines range did not include the two-level enhancement under § 2B1.1(b)(9)(A) for solicitation on behalf of a political organization. Mot. at 16; Plea Agmt. at 7. However, the plea agreement also acknowledges that the parties' agreement as to the guidelines range is not binding on the Court, which "will conduct its own, independent calculation of the proper sentencing guidelines." Plea Agmt. at 7. Consistent with its obligations in the plea agreement, the government will not advocate for including the two-level enhancement in § 2B1.1(b)(9)(A), but of course the Court must make its own determination of the correct application of the Guidelines.

D.     **The Defendant Did Not Provide Substantial Assistance.**

The defendant is accurate in stating that he engaged in a proffer with FBI agents in an effort to provide substantial assistance to the government. Mot. at 11-12. However, none of the information provided by the defendant ultimately proved useful or actionable. Accordingly, the government is not making a motion under § 5k1.1 to reflect the defendant's assistance, and he should not be given credit for such efforts.

IV.    **THE SECTION 3553(A) FACTORS**

It is well established that a court must consider a variety of factors in imposing a sentence on a criminal defendant, beginning with the applicable range established by the Guidelines. *See* 18 U.S.C. § 3553; *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (noting that guidelines ranges "serve as one factor among several courts must consider"). Although the Guidelines are advisory in nature, courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005); *Nelson v. United States*, 555 U.S. 350, 351 (2009) (noting that a sentencing court "must first calculate the Guidelines range"). The court then must consider the sentencing factors set forth in 18 U.S.C. § 3553(a), including (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant; (3) the kinds of sentences available; (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (5) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). Applying these factors to this case, a Guidelines sentence for both counts is appropriate and reasonable.

**A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))**

<u>First</u>, the nature and seriousness of the defendant's conduct deserve a serious and meaningful punishment because the scheme was complex and the result of multiple criminal choices. From the moment the defendant began soliciting political contributions for KAIRC, without first (or ever) registering with the FEC, he initiated a series of willful and deliberate criminal acts. The defendant lied to potential donors, abusing the donors' faith in him and the political process. He misled donors about which (if any) candidates KAIRC and KOIRC were supporting, and induced them to contribute more by misrepresenting Person A's involvement with KAIRC, KOIRC, and with the defendant more generally. Worst of all, he used their donations to line his own pockets, not to further the political goals his donors believed in.

<u>Second</u>, the defendant's fraud undermined one of the most important rights we have—the First Amendment right to participate in our democracy. As the Supreme Court has stated, "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (*quoting Roth v. United States*, 354 U.S. 476, 484 (1957)). The donors to the defendants' "PACs" were exercising one of our most important and cherished rights by giving their money to support certain political causes and candidates. The defendant enticed them to do so by falsely representing that he would contribute to candidates, support causes, and dedicate "100%" of contributed funds to those causes. Instead he kept most of the money for himself and used the amounts he did contribute to burnish his own political reputation. In doing so, he deprived his donors of not only their hard-earned money, but also their political

10

voice. The elections those donors intended to express themselves in have come and gone; they cannot again have the chance to make the impact they hoped for.

Third, ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

    ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████

    ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

11

The defendant's crimes represent a corruption of the political process, and as such must be punished accordingly. As the courts has recognized, "When it comes to political corruption, the community—historically and presently—requires that real, tangible, and severe consequences meet those who gain a position of public trust and then abuse that trust for personal gain." *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa), *aff'd*, 705 F. App'x 481 (8th Cir. 2017). The defendant was aware of the position of trust he was in as the "Executive Director" of KAIRC and KOIRC, having previously run for office. He advertised himself to others as a resource—as a means through which others could express their political wills through financial support. The defendant abused that trust for his own gain.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))

A substantial prison sentence is vital to accomplish the purpose of § 3553(a)(2)(A): to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense. Regarding the seriousness of the offense, the defendant relied on his knowledge of fundraising and political strategy (from his time fundraising for his own Congressional campaign and his employment with Involvement, Inc., a political consulting strategy firm, and other campaigns), PSR ¶¶ 91, 93-96, to use KAIRC and KOIRC to further his fraud and develop a fundraising strategy around them. The defendant sought out friends and strangers to solicit contributions to KAIRC and KOIRC, and told them that 100% of the funding would go to candidates, when in actuality, he spent 60% on himself. He lied to them repeatedly, representing that the PACs were volunteer-only, while also touting himself as the Executive Director and paying himself directly from the PAC. He also opened two PACs (one regarding federal office and one

12

regarding state office) and tailored his solicitations to donors, including advertising a fraudulent donor match program.

When the defendant *did* spend PAC funds on candidates, he did so without any regard for federal or state campaign finance laws. As a former campaigner, political strategist, and former candidate for office, the defendant was aware that his actions were unlawful. Likewise, the defendant was aware that by over-contributing and deceiving the FEC, his conduct would have a substantial effect on voters' political power and on candidates' fundraising efforts.

These are the harms that Congress sought to prevent when it imposed limitations on political spending and reporting obligations. The defendant subverted a process that Congress and federal agencies have worked to preserve in order to maintain integrity and fairness in elections. It follows that the sentence should reflect the seriousness of the defendant's flagrant disregard for election laws, and his abuse of the political process. Not only was the defendant aware of these laws, but he employed sophisticated means to solicit contributions in excess of what would be permitted for a federal PAC that could contribute to candidates and their committees. A within-Guidelines sentence addresses the seriousness of the Defendant's actions and signals the need for the citizens to comply with and respect the law.

Finally, the defendant significantly understates the impact of his fraud on his victims. Some victims are not requesting restitution and profess an ongoing confidence in the defendant, this is not universal among all victims. For example, one victim who donated a total of $325 stated that "this has been so upsetting to me and my family." Another victim noted that he donated $10 "under false pretenses." The impact on these donors of relatively small amounts is important, as is the elephant in the room which is completely ignored by the defendant's sentencing

memorandum: <u>the defendant defrauded $1,275,000 from one married couple</u>. This is no run-of-the-mill fraud, and it must be punished accordingly.

  **C. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))**

While there is no evidence to suggest the defendant presents a risk of re-offending, the Court's sentence should reflect the need to promote general deterrence. The sentence in this case should be sufficiently serious to deter PAC chairpersons, treasurers, and others holding positions of public trust from prioritizing individual wants and desires over transparency and responsibility. This is especially important given cases such as these trigger individuals' anxieties about politics, contributing to candidates, and trusting in the democratic process and its agents.

Unlike other fraud cases, in which there are few identifiable victims, the PSR cites a total 267 victims in this case. PSR ¶ 30. While some may have reported no loss, the collective damage to the victim's confidence in the political process warrants a sentence within Guidelines range. In sum, the net impact of the defendant's scheme was long and far-reaching. His sentence should reflect this and deter others from choosing a similar path of crime.

  **D. The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))**

The defendant greatly underestimates the severity of the harm caused by the defendant's crimes in arguing that the offense level "substantially overstates the seriousness of the offense." Def.'s Sentencing Mem. at 25-26. To the contrary, the offense level appropriately reflects that the defendant perpetrated a large fraud, including fraudulently obtaining $1,275,000 from a single married couple. The defendant is correct that many donors contributed small amounts of money, but this in no way minimizes the severity of the fraud. This situation is nothing like the example from application note 20(c) to Section 2B1.1 (*see* Def.'s Sentencing Mem. at 25); the defendant did not make a single false representation to the public that was magnified through the large

14

number of owners of a single security. The defendant sought out his victims, sending them false solicitations. The depth of his fraud is demonstrated by his focused attention and repeated solicitations of Donors A and B, once he saw that they would contribute large amounts of money to him. The defendant put out many fraudulent solicitations, but truly focused his fraud when he found a willing victim, and as a result, fraudulently obtained $1,275,000. This is the largest driver of the defendant's guidelines range, which is entirely appropriate, based on his fraud.

The defendant's requested sentence, 24 months in a halfway house and an 18 month term of probation, coupled with no more than $100,000 in restitution, amounts to little more than a slap on the wrist and would be an affront to the defendant's victims and the criminal justice system. Furthermore, it is not authorized under the Guidelines. The PSR calculates the defendant's adjusted offense level as 22; even if the court is not inclined to add two levels for the sophisticated means, this Court would have to vary from that offense level by 9 levels—amounting to a two-thirds reduction in the low end of the guidelines range—to arrive at Zone C, where the guidelines allow for a probationary sentence. USSG §§ 5C1.1(d); 5C1.1(f). Furthermore, the guidelines provide that a sentence of confinement at a halfway house cannot be imposed without also imposing at least some imprisonment unless the offense level is in Zone A, which would require this Court to vary by 14 levels, to an advisory guidelines range of 0-6 months, essentially giving the defendant a complete pass on his criminal conduct. *Id*. at § 5C1.1(b). The defendant's suggested sentence is without support, unjust, and should be dismissed out of hand. A sentence of incarceration at the low end of the advisory guidelines range, coupled with full restitution, is the appropriate resolution of this case.

15

### E. The Need to Provide Restitution to Any Victims of the Offense (18 U.S.C. § 3553(a)(7))

The defendant's request that no more than $100,000 in restitution be ordered is contrary to the law. The applicable statutes and the Guidelines are clear; the Mandatory Victims Restitution Act "gives the court no discretion in ordering restitution in cases of fraud." *United States v. Cheal*, 389 F.3d 35, 53 (1st Cir. 2004); 18 U.S.C. § 3663A(a)(1); USSG § 5E1.1. Section 3663A provided that "when sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense." Subsection (c) includes "an offense against property under this title, including any offense committed by fraud or deceit." *Id*. at § 3663A(c)(1).

Further, the parties acknowledged the need for full restitution to be ordered in the plea agreement.

> In addition to the other penalties provided by law, **the Court must also order Defendant to make restitution pursuant to 18 U.S.C. § 3663A**. Defendant understands that restitution must be **ordered by the Court to all victims of Defendant's criminal conduct** and not merely to those victims included in the counts to which Defendant agrees to plead guilty. **It is the parties' intention and understanding that restitution is appropriate and should be ordered for all victims** of the two counts of conviction; that is donors to Defendant's two purported political action committees, as charged in the Information.

Plea Agmt. at 4-5 (emphasis added). The cases cited by the defendant in its argument that this Court should refuse to order full restitution did not arise under the MVRA, 18 U.S.C. § 3663A. Mem. at 14, *see, e.g. United States v. Rostoff*, 164 F.3d 63, 66 (1st Cir. 1999) (addressing 18 U.S.C. § 3663); *United States v. Seale*, 20 F.3d 1279, 1281 (3d Cir. 1994) (occurring before the MVRA was passed in 1996).

Case 1:19-cr-00013-RP   Document 48-2   Filed 10/22/19   Page 17 of 18

Under the MVRA, the Court "may take a defendant's financial resources into account only insofar as they affect "the manner in which, and the schedule according to which, the restitution is to be paid." *Cheal*, 389 F.3d at 53 (citing 18 U.S.C. § 3664(f)(2)).  Accordingly, this Court must order full restitution but may take into account the defendant's circumstances in ordering a payment schedule.

In doing so, this Court should consider that the defendant here has a college education and a large professional network.  The defendant may be correct that he may not be able to continue in engaging in political fundraising work after his sentence, he is a young man with a college education and professional experience who has the ability to make a good living in the future.  The defendant need not have liquid assets to enable him to pay the restitution immediately.  Over the course of his life, his future earnings are likely to enable him to make full restitution, even if it take a long time.

### V. CONCLUSION

For the foregoing reasons, the United States requests that the Court impose a sentence at the low end of the Guideline range as found by the Court, to be followed by a period of supervised release, and order restitution in the amount of $1,102,439.

Respectfully submitted,

ANNALOU TIROL
Acting Chief
Public Integrity Section

*/s/*
Peter M. Nothstein
Trial Attorney
U.S. Department of Justice
Criminal Division, Public Integrity Section
1400 New York Avenue, NW
Washington, DC 20005

17

**Certificate of Service**

  I hereby certify that a true and correct copy of the foregoing was served upon Jeffrey B. Pine and Eric R. Levine, counsel for the defendant, and the U.S. Probation Office on July 22, 2019.

              /s/_____
              Peter M. Nothstein
              Trial Attorney